IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Harriet Darlene Cornett, | ) | C/A No.: 1:16-1108-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This pro se appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Margaret B. Seymour dated April 12, 2016, referring this matter for disposition. [ECF No. 12]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 4].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the court affirms the Commissioner's decision.

I.    Relevant Background

A.    Procedural History

On January 15, 2013, Plaintiff protectively filed applications for DIB and SSI in which she alleged her disability began on October 20, 2012. Tr. at 81, 82, 221–28, and 229–37. Her applications were denied initially and upon reconsideration. Tr. at 149–53, 157–58, and 159–60. On September 9, 2014, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Carl B. Watson. Tr. at 32–56 (Hr'g Tr.). The ALJ issued an unfavorable decision on October 29, 2014, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 9–31. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–7. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on April 8, 2016. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 53 years old at the time of the hearing. Tr. at 36. She obtained a bachelor's degree. *Id.* Her past relevant work ("PRW") was as a security guard and a personal banker. Tr. at 52–53. She alleges she has been unable to work since October 20, 2012. Tr. at 221 and 229.

2.    Medical History

Plaintiff was admitted to Marymount Medical Center on October 19, 2007, after presenting to an urgent care facility with bilateral leg edema. Tr. at 377. She reported

chest pain and a two-week history of shortness of breath that was worsened by exertion. *Id.* An echocardiogram ("echo") showed Plaintiff to have normal left ventricular systolic function; normal wall motion; an ejection fraction of 55%; no pericardial effusion; no interatrial septum shunt; no mitral valve prolapse; a normal aorta; trace mitral regurgitation; and mild tricuspid regurgitation. Tr. at 389. Cardiologist Rachna Garg, M.D. ("Dr. Garg"), examined Plaintiff and reviewed diagnostic studies on October 20, 2007. Tr. at 380–82. He ruled out myocardial infarction, but recommended Plaintiff undergo a Persantine stress test and venous duplex study. Tr. at 382.

Plaintiff presented to cardiologist Israel D. Garcia, M.D. ("Dr. Garcia"), on January 6, 2011, with complaints of chest pain, shortness of breath, and leg edema. Tr. at 440. Dr. Garcia ordered an echo, a cardiolite stress test, a 24-hour Holter monitor, a carotid ultrasound, and multiple blood tests. Tr. at 442. On January 10, 2011, the Holter monitor report showed sinus rhythm and a few premature ventricular and premature atrial contractions. Tr. at 438–39. On January 14, 2011, an echo showed Plaintiff to have an ejection fraction of 69%; normal bilateral ventricular size and function; no significant valve disease; and mild mitral and tricuspid regurgitation. Tr. at 435–37. On January 20, 2011, Plaintiff's nuclear stress test was abnormal with myocardial ischemia. Tr. at 431–32. On February 3, 2011, a cardiac catheterization showed normal coronary arteries and normal left ventricular function. Tr. at 446–47. Plaintiff followed up with Dr. Garcia on February 17, 2011. Tr. at 428–30. Dr. Garcia ruled out acute diastolic heart failure, indicated Plaintiff's essential hypertension and chest pain had improved, and assessed her

3

history of congestive heart failure as stable. Tr. at 430. On February 23, 2011, a carotid ultrasound showed Plaintiff to have normal arteries with no stenosis. Tr. at 420–21.

Plaintiff presented for an initial physical therapy evaluation on March 16, 2011. Tr. at 452. She complained of pain in her bilateral hips and lumbar spine and plantar fasciitis in her left foot. *Id.* Physical therapist Dustin R. Barrett ("Mr. Barrett"), observed Plaintiff to present with a limp and increased lordosis in her lumbar region. *Id.* Plaintiff stated she felt better with movement and worse when she stood still. *Id.* She reported being active and walking five miles on three days per week. *Id.* Mr. Barrett recommended skilled rehabilitative therapy and a home exercise program. Tr. at 454.

Plaintiff received treatment in March and April 2011 for high myopia and increased ocular pressure. Tr. at 470–76. On August 17, 2011, she indicated her visual acuity was good, but continued to complain that she had difficulty reading fine print and that objects at a distance appeared blurry. Tr. at 747.

Plaintiff was discharged from physical therapy on May 12, 2011, secondary to noncompliance with attendance. Tr. at 967–68.

On August 18, 2011, Dr. Garcia indicated Plaintiff was stable from a cardiovascular standpoint. Tr. at 517.

Plaintiff reported improved visual acuity on September 2, 2011. Tr. at 745.

On August 3, 2012, Plaintiff reported to Jimmie Ryals, APN ("Mr. Rials"), that stress and anxiety were causing her heart rate to increase. Tr. at 626. She indicated she had chronic stress and anxiety, but that it had increased over the prior two-week period. *Id.* Mr. Rials observed Plaintiff to be alert; oriented to time, place, and person; and

anxious. Tr. at 627. He assessed palpitations and anxiety disorder, not otherwise specified ("NOS"), prescribed Buspirone, and referred Plaintiff for an electrocardiogram ("EKG"). *Id.*

On October 15, 2012, Plaintiff presented to Kayla Norman, APN ("Ms. Norman"), with a one-week history of lower back pain that had begun after her employer kicked her chair. Tr. at 550. Ms. Norman noted Plaintiff demonstrated tenderness to palpation and spasm in her lower lumbar spine, but had full range of motion ("ROM") and normal gait, balance, motor strength, and sensation. Tr. at 551. She prescribed Flexeril, Naproxen, and Prednisone and referred Plaintiff for x-rays. *Id.*

Plaintiff reported her pain had improved on October 17, 2012. Tr. at 548. Ms. Norman indicated Plaintiff had full ROM in her spine, but muscle spasms and tenderness to palpation in her lower lumbar spine. Tr. at 549.

On December 3, 2012, Plaintiff presented to Amanda Moorhouse, APN ("Ms. Moorhouse"), with complaints of pain in her left knee, weakness in her hips, and popping in her head, neck, and lower back. Tr. at 546. Ms. Moorhouse observed Plaintiff to have full, but painful ROM of her spine; no edema; no deformities; intact pedal pulses; decreased ROM on flexion and extension of the neck; bilateral sacroiliac joint tenderness; full ROM of the bilateral lower extremities; and intact sensation and pedal pulses. Tr. at 547.

On December 19, 2012, magnetic resonance imaging ("MRI") of Plaintiff's cervical spine showed multilevel degenerative changes. Tr. at 534. It also indicated a moderate disc protrusion associated with osteophyte formation at C5-6 that resulted in

moderate central canal stenosis and moderate-to-severe right-sided exit foraminal narrowing. *Id.* An MRI of Plaintiff's lumbar spine indicated mild facet joint degenerative changes, but no evidence of any significant bulge or herniation. Tr. at 535. An MRI of Plaintiff's thoracic spine was negative. Tr. at 639.

Plaintiff followed up with Ms. Moorhouse to discuss the MRI results on December 28, 2012. Tr. at 544. Ms. Moorhouse observed Plaintiff to have full, but painful ROM of her spine; no edema; decreased ROM on flexion and extension of her neck; bilateral sacroiliac joint tenderness; full ROM of her bilateral lower extremities; and intact sensation and pedal pulses. *Id.* She referred Plaintiff to a neurosurgeon. *Id.*

Plaintiff followed up with Ms. Norman on February 4, 2013, for allergic rhinitis. Tr. at 540. She requested that her prescription for Lasix be refilled. *Id.* Ms. Norman indicated Plaintiff had no sign of infection. Tr. at 541. She refilled Lasix for edema. *Id.*

Plaintiff presented to East Tennessee Brain and Spine Center for an assessment on January 22, 2013. Tr. at 654. She reported that she had begun to experience neck stiffness in August and had developed occasional fleeting pain into her right shoulder. *Id.* She denied paresthesias in her hands and gait disturbance. *Id.* Will Beringer, D.O. ("Dr. Beringer"), diagnosed cervical spondylosis. Tr. at 655. He indicated Plaintiff did not show evidence of a fixed cervical radiculopathy. *Id.* He noted that she had low back pain, but no sciatic symptoms and a normal thoracic MRI. *Id.* He informed Plaintiff that she had "nothing dangerous in the cervical spine" and referred her to physical therapy for traction and strengthening exercises. *Id.*

Plaintiff presented to Juduan Alison, M.D. ("Dr. Allison"), on February 5, 2013, with complaints of pressure behind her eyes and blurred vision. Tr. at 523. Dr. Alison indicated Plaintiff's right acuity without glasses was 20/20 and her left acuity without glasses was 20/25. Tr. at 525. He assessed glaucoma, pseudophakia, and posterior vitreous detachment in both eyes and instructed Plaintiff to follow up in four months. *Id.*

On February 28, 2013, Plaintiff informed physical therapist Theresa Huff ("Ms. Huff"), that she felt like physical therapy was aggravating her pain and visual disturbances. Tr. at 675. Ms. Huff indicated Plaintiff "did not seem to give full effort" during manual muscle testing. Tr. at 676. She referred Plaintiff back to Dr. Beringer for further assessment of her pain complaints. *Id.*

On March 4, 2013, state agency medical consultant Thomas Thrush, M.D. ("Dr. Thrush"), assessed Plaintiff's physical residual functional capacity ("RFC"). Tr. at 65–67. He indicated Plaintiff had the following limitations: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; and reach overhead with the bilateral upper extremities no more than frequently. *Id.* State agency psychological consultant Andrew Phay, Ph. D. ("Dr. Phay"), indicated Plaintiff had failed to establish any medically-determinable mental impairment. Tr. at 64.

On March 5, 2013, Dr. Beringer noted that Plaintiff had some spondylotic problems at C5-6 and C6-7 that were "mild at best." Tr. at 670. Plaintiff informed Dr. Beringer that her neck pain had worsened since she had been injured in a car accident on

February 1, 2013,[1] and that she was hardly able to move her neck. *Id.* Dr. Beringer observed Plaintiff to have very limited ROM of her neck and to be tender over the posterior cervical regional, but to have good strength in her arms. Tr. at 671. He placed Plaintiff in a cervical collar and referred her for a computed tomography ("CT") scan. *Id.* The CT scan indicated minor cervical spondylosis at C5-6 and asymmetrical facet arthropathy on the left at C4-5, but no acute injury. Tr. at 696.

On March 20, 2013, Plaintiff reported neck pain that "throbs like a toothache." Tr. at 944. Dr. Beringer indicated Plaintiff's CT scan showed some minor spondylosis at C5-6, but no evidence of a fracture or subluxation. Tr. at 945. He ordered flexion and extension x-rays of Plaintiff's neck and indicated they did not show any significant ligamentous injury. Tr. at 946. He stated Plaintiff did not require the cervical collar and should resume physical therapy. *Id.* He indicated he would consider administering injections if Plaintiff's physical therapy was ineffective. *Id.*

On March 29, 2013, Plaintiff indicated she was using a cervical collar because the vibration of walking aggravated her neck pain. Tr. at 663. She stated she was unable to move her head to a neutral position. *Id.* She also complained that she had pressure in her head and eyes, shooting pain into her right hip, and was unable to walk straight. Tr. at 663. Dr. Beringer observed Plaintiff to have decreased cervical and bilateral upper extremity ROM and decreased strength. Tr. at 664. He noted that Plaintiff did not appear to provide full effort. Tr. at 665.

---

[1] Dr. Beringer noted that Plaintiff declined to visit the emergency room after the accident and failed to inform Ms. Huff that she was injured in an accident during a physical therapy session following the accident. Tr. at 670.

On April 18, 2013, Plaintiff sought treatment for neck pain and reported that Dr. Beringer had discharged her from his practice. Tr. at 871. Steven Gardner, P.A. ("Mr. Gardner"), observed Plaintiff to have decreased ROM and decreased effort when he assessed the ROM of her neck. Tr. at 872.

Plaintiff presented to Johnson City Medical Center on April 27, 2013, for abdominal pain and rectal bleeding. Tr. at 683. She was diagnosed with gastrointestinal bleeding and a urinary tract infection. Tr. at 679.

Plaintiff presented to Jomar Roberts I, M.D. ("Dr. Roberts"), for a comprehensive orthopedic examination on June 1, 2013. Tr. at 702. She reported constant cervical pain that she rated as a nine on a 10-point scale. *Id.* She denied bowel and bladder incontinence, but reported leg weakness that had caused her to fall roughly 20 times over the past year. *Id.* She stated her neck pain was exacerbated by a car accident that occurred in February 2013. *Id.* She indicated she had last worked in a call center in September 2012, but stated she did not leave the job because of her health. *Id.* Dr. Roberts observed Plaintiff to ambulate with a normal gait; to have normal grip strength; to have normal ROM of the lumbar spine, shoulders, elbows, forearms, wrists, hips, knees, and ankles; to have lateral flexion and bilateral rotation of the cervical spine reduced to 10 degrees[2]; negative straight-leg raising test; normal abilities to walk on heels and toes, to squat, and to perform heel-to-toe tandem gait.; normal mental status; 20/40 visual acuity on the right and 20/70 visual acuity on the left, without glasses; 5/5 motor strength in all muscle groups; intact sensation; and normal reflexes. Tr. at 704–05. He assessed cervicalgia, but

---

[2] Dr. Roberts indicated normal lateral flexion was to 45 degrees and normal bilateral rotation was to 80 degrees. Tr. at 704.

indicated Plaintiff gave "deliberate poor effort through ROM portion of cervical exam." Tr. at 705.

On June 24, 2013, state agency medical consultant Irene Richardson, M.D. ("Dr. Richardson"), assessed Plaintiff's RFC. Tr. at 111–14. She indicated the following limitations: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; no more than frequently lifting overhead with the bilateral upper extremities; and restricted from work requiring full visual fields for function and safety. *Id.*

On June 28, 2013, state agency psychological consultant Manhal Wieland, Ph. D. ("Dr. Wieland"), noted that Plaintiff repeatedly denied depression and anxiety and did not allege any mental impairments on her initial or reconsideration applications. Tr. at 110. He concluded there was no evidence for any medically-determinable mental impairment. *Id.*

Plaintiff presented to Richard Young, M.D. ("Dr. Young"), with urinary urgency and leakage on July 24, 2013. Tr. at 900–04. She denied back pain and stated she did not know the source of her incontinence. Tr. at 900. Plaintiff indicated she experienced urinary frequency every two hours and needed to use the restroom two to three times during the night. *Id.* Dr. Young prescribed Vesicare. Tr. at 903.

Plaintiff was admitted to McLeod Loris/Seacoast Hospital on August 6, 2013, after presenting with chest pain. Tr. at 752. Plaintiff's chest x-ray showed a mildly enlarged cardiac silhouette, but no acute findings. Tr. at 754. Her EKG was normal, aside

from episodes of sinus bradycardia in the 50s. *Id.* Nathan Almeida, M.D. ("Dr. Almeida"), recommended an exercise nuclear stress test and an echo. *Id.* Both the stress test and the echo showed normal results. Tr. at 760. Plaintiff was discharged on August 8, 2013, with diagnoses of chest pain, hypertension, hypothyroidism, and bradycardia. *Id.*

On August 14, 2013, Plaintiff reported to Dr. Young that she had only taken one dose of Vesicare. Tr. at 907. Dr. Young continued Plaintiff's prescription and instructed her to follow up in one month. *Id.*

Plaintiff followed up with Dr. Almeida on August 28, 2013. Tr. at 976. She reported a couple of episodes of retrosternal chest pressure per week. *Id.* She complained of excessive daytime sleepiness and fatigue and inadequate sleep quality. *Id.* Dr. Almeida observed no abnormalities on examination. Tr. at 976–77. He noted Plaintiff had symptoms of obstructive sleep apnea and referred her for a sleep study. Tr. at 977.

On September 18, 2013, Plaintiff reported that Vesicare provided some relief, but that she continued to wear three to four thin pads per day. Tr. at 910. Dr. Young continued her treatment and instructed her to follow up in six months. Tr. at 912.

On November 13, 2013, an esophagogastroduodenoscopy ("EGD") showed erosion and erythema in the antrum and was consistent with gastritis. Tr. at 881 and 887–88. Although mucosa was consistent with Barrett's esophagitis, a biopsy was negative. *Id.* A colonoscopy indicated mild diverticulosis with several diverticula and non-bleeding internal hemorrhoids. *Id.*

On November 21, 2013, Dr. Almeida observed Plaintiff to have mildly decreased ROM in her upper and lower extremities, but no other abnormalities. Tr. at 973–74. He

stated Plaintiff had atypical chest pain that was likely related to gastroesophageal reflux disease ("GERD"). Tr. at 974. He indicated Plaintiff's blood pressure was well-controlled on low-dose Lisinopril and that her lipids were at their goal. *Id.* He noted Plaintiff had good aerobic functional capacity, as demonstrated by a recent stress study. *Id.* He stated a recent sleep study was negative for sleep apnea. *Id.* Dr. Almeida encouraged Plaintiff to continue regular aerobic exercise and weight loss. *Id.*

Plaintiff presented to Jessica Thasitis, FNP ("Ms. Thasitis"), for treatment of GERD on December 3, 2013. Tr. at 881. She noted Plaintiff had been walking a mile-and-a-half on most days, without reduced exercise tolerance, chest pain, or shortness of breath. *Id.* Plaintiff reported one episode of right lower quadrant abdominal pain during the prior week, but indicated it resolved on its own. Tr. at 882. Ms. Thasitis provided samples of Dexilant to Plaintiff and instructed her on a reflux diet and the benefit of small, frequent meals. Tr. at 884. She stressed to Plaintiff the need to be compliant with her medication for hypothyroidism. *Id.*

On March 12, 2014, Plaintiff reported that Vesicare helped her incontinence, but indicated she had to discontinue the medication for a month while she was in the process of switching insurance plans. Tr. at 914.

Plaintiff complained of hemorrhoidal discomfort on March 24, 2014. Tr. at 877. She indicated she had noticed incomplete defecatory emptying, bright red blood, a lump around her rectum, and mild reflux with burping. *Id.* Ms. Thasitis indicated Plaintiff's rectal discomfort was likely caused by an external hemorrhoid. Tr. at 879. She recommended Plaintiff start taking a daily fiber supplement with Miralax. *Id.* She noted

Plaintiff's breakthrough GERD symptoms were likely the result of a medication change and suggested Plaintiff should continue her reflux diet and restart Dexilant. *Id.*

Plaintiff presented to Coastal Eye Group for a glaucoma evaluation on March 27, 2014. Tr. at 988. She complained of decreased visual acuity at night. *Id.* She stated she saw light flashes at night that looked like laser beams and that caused headaches. *Id.* Carl F. Sloan, M.D. ("Dr. Sloan"), indicated Plaintiff had full motility, but restricted visual field. Tr. at 988. His impression was open-angle glaucoma. Tr. at 989.

On April 25, 2014, Plaintiff complained of nose bleeds and increased blood pressure associated with Vesicare and Flomax. Tr. at 920. Dr. Young discussed multiple treatment options with Plaintiff, prescribed Toviaz, and encouraged her to perform Kegel exercises and to follow up in one month. Tr. at 923.

Plaintiff presented to Thomas Anderson, M.D. ("Dr. Anderson"), on May 13, 2014, complaining of pain all over. Tr. at 931. She reported a history of two automobile accidents that had caused pain in her neck and middle and lower back. *Id.* She complained of constant numbness in her hands and feet. *Id.* She stated she had received no treatment for her neck or back in the last six months. *Id.* Dr. Anderson observed Plaintiff to have normal strength and reflexes in her bilateral upper and lower extremities. Tr. at 932. He indicated he would review an MRI of Plaintiff's cervical spine before determining the best course of action.[3] *Id.*

---

[3] On May 22, 2014, Select Health of South Carolina sent a letter informing Dr. Anderson that their medical director had reviewed the request for a cervical MRI and had found that Plaintiff did not meet the criteria for medical necessity. Tr. at 960.

Plaintiff followed up with Dr. Almeida on May 15, 2014. Tr. at 969. She reported occasional retrosternal chest discomfort when engaging in physical activity in the heat of the day, and but indicated she was able to engage in aerobic exercise at the gym without difficulty. *Id.* Dr. Almeida observed Plaintiff to have mildly decreased ROM in her upper and lower extremities, but found no other abnormalities on physical examination. Tr. at 970. He assessed non-cardiac chest pain, stable bradycardia, well-controlled hypertension, moderate GERD, and improved sleep apnea. *Id.* He recommended Plaintiff use a proton-pump inhibitor for GERD, but indicated she did not require aspirin because there was no evidence of coronary artery disease. *Id.*

Plaintiff reported improved symptoms with Toviaz on June 4, 2014, but indicated she continued to have occasional trouble with urinary urge incontinence. Tr. at 926. Dr. Young refilled Toviaz and indicated he would consider urodynamic testing if Plaintiff's symptoms worsened. Tr. at 928.

Plaintiff underwent an MRI of the brain on September 25, 2014, that revealed a single nonspecific T2 white matter hyperintensity in the right frontal lobe. Tr. at 991–93.

C.     The Administrative Proceedings

1.     The Administrative Hearing

a.     Plaintiff's Testimony

At the hearing on September 9, 2014, Plaintiff testified she last worked in December 2012. Tr. at 36. She stated she worked for three or four days, but that she left the job because her vision problems were causing her to mistake numbers. *Id.* She indicated her last successful job was as a personal banker for Bank of America in 2009 or

14

2010. Tr. at 36–37. She testified she was fired from a job at Dairy Queen because she made mistakes as a result of difficulty reading the order screen. Tr. at 37. She indicated she worked for a couple of months as a data entry clerk, but was laid off from that job because of a slow-down in work. *Id.* She testified her PRW also included jobs as a customer care representative, a security guard, and a news reporter. Tr. at 37–38.

Plaintiff stated she had moved from Tennessee to the South Carolina coast because she felt threatened by her ex-husband and desired to improve her son's asthma symptoms. Tr. at 42–43. She indicated she lived with her children in a third floor apartment. Tr. at 43.

Plaintiff testified that she had a stroke in 2000 that resulted in problems with memory, concentration, and mobility. Tr. at 39. She indicated she had residual weakness on her left side. *Id.* She stated she continued to have short-term memory loss and problems with concentration. Tr. at 40. She testified she sometimes was slow to respond to questions and easily forgot things. *Id.* She stated she had to write notes and keep a calendar as reminders. *Id.*

Plaintiff testified she had a heart attack in 2004. Tr. at 40. She indicated she visited an urgent care center because she noticed her feet were swelling. *Id.* She stated the doctor told her that she was having heart difficulties and admitted her to the hospital. *Id.* She indicated her doctor recommended she undergo placement of three stents, but that she declined the procedure because she was afraid of complications. Tr. at 40–41.

Plaintiff testified that she had begun to develop back pain four years earlier. Tr. at 41. She indicated she had been in several car accidents, but that her back pain had

increased significantly since her vehicle was rear-ended in 2013. Tr. at 41–42. She stated her back injury had caused her to become incontinent. Tr. at 50.

Plaintiff testified she had recently been referred to a neurologist because of bradycardia, vision problems, pain in her head and neck, numbness in her face and throat, and difficulty swallowing. Tr. at 45. She stated the neurologist had referred her for an MRI the prior week and had recommended she undergo neck surgery. *Id.* Plaintiff indicated she had recently been diagnosed with glaucoma. Tr. at 46. She stated the glaucoma specialist indicated her loss of peripheral vision was not a result of glaucoma and referred her to another neurologist, who recommended a brain scan. *Id.*

Plaintiff testified she was unable to work because of dizziness and blurred vision. Tr. at 47. She stated she walked with a cane and avoided walking, strenuous activity, lifting, pushing, and pulling. Tr. at 47 and 48. She indicated she used a neck brace to avoid moving her neck and increasing her pain. Tr. at 47. She estimated she could stand for no more than five minutes. Tr. at 49. She stated she could sit for five or ten minutes before she developed numbness in her legs. Tr. at 49–50.

Plaintiff testified she had recently begun to take Amitriptyline for nerve pain, depression, and anxiety. Tr. at 48. She stated that some medications had exacerbated symptoms of glaucoma in the past. Tr. at 48–49. She indicated she used a transcutaneous electrical nerve stimulation ("TENS") unit for back pain, but was unable to participate in physical therapy for her back until her neck problems were resolved. Tr. at 49.

Plaintiff confirmed that she had a driver's license and was able to drive short distances. Tr. at 50. She testified she washed dishes, prepared meals, and did laundry. Tr.

at 50. She indicated she took breaks to sit down while cooking and that her children helped her to move wet clothing from the washer to the dryer. *Id.* Plaintiff stated she did some shopping. Tr. at 51. She indicated that a typical day involved waking her son for school; preparing his breakfast; driving him to school; taking her medication; engaging in housework or crocheting; rinsing the dishes and loading the dishwasher; picking up her son from school; walking around; cooking dinner; and helping her son with his homework. Tr. at 51–52.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Arthur Schmitt, Ph. D., reviewed the record and testified at the hearing. Tr. at 52–55. The VE categorized Plaintiff's PRW as a security guard, *Dictionary of Occupational Titles* ("*DOT*") number 372.667-034, as light with a specific vocational preparation ("SVP") of three and a personal banker, *DOT* number 186.167-036, as sedentary with an SVP of eight. Tr. at 52–53. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform medium work; could occasionally reach overhead with the bilateral upper extremities; could not climb ladders, ropes, or scaffolds; and should avoid working at unprotected heights or around dangerous machinery. Tr. at 53. The VE testified that the hypothetical individual could perform unskilled, medium jobs as an egg packer, *DOT* number 920.687-134, with 1,982 positions in South Carolina and 306,000 positions nationally; a janitor, *DOT* number 381.687-018, with 27,600 positions in South Carolina and 2,090,000 positions nationally; and a laundry operator, *DOT* number 362.686-014, with 3,190 positions in South

Carolina and 211,000 positions nationally. Tr. at 53–54. He stated the individual would be unable to perform any of Plaintiff's PRW. Tr. at 54.

The ALJ next asked the VE to consider a hypothetical individual of Plaintiff's vocational profile who could perform light work with the additional limitations indicated in the first hypothetical question. *Id.* The VE identified unskilled, light jobs as a storage facility rental clerk, *DOT* number 295.367-026, with 4,400 positions in South Carolina and 416,000 positions nationally; a garment packer/machine tender, *DOT* number 920.665-018, with 9,800 positions in South Carolina and 706,000 positions nationally; and a ticket taker, *DOT* number 344.667-010, with 1,260 positions in South Carolina and 104,000 positions nationally. *Id.*

The ALJ asked the VE to assume the individual would be absent three times per month on a consistent basis and asked if there would be any jobs she could perform. Tr. at 54–55. The VE stated there would be no jobs. Tr. at 55.

### 2.    The ALJ's Findings

In his decision dated October 29, 2014, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.
2.    The claimant has not engaged in substantial gainful activity since October 20, 2012, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3.    The claimant has the following severe impairments: degenerative disc disease of the cervical and lumbar spine, diverticulitis, hypertension, hypothyroidism, gastroesophageal reflux disease, and coronary artery disease with status-post myocardial infarction (20 CFR 404.1520(c) and 416.920(c)).
4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments

in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). Light exertional work is described by the Commissioner of the Social Security Administration as requiring lifting and carrying of up to 20 pounds occasionally and 10 pounds frequently and standing, walking, and sitting for 6 hours in an 8-hour workday. The claimant can occasionally reach overhead bilaterally; but she can never climb ladders, ropes, or scaffolds. She must avoid working at unprotected heights or around dangerous machinery.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on May 3, 1961 and was 51 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from October 20, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 14–24.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ did not adequately assess Plaintiff's severe impairments at step two;

2)    the ALJ erred in finding Plaintiff's impairments did not meet or equal the requirements for a finding of disability under Listing 1.04;

19

3)    the ALJ did not adequately consider the evidence that supported a finding of disability under Listing 12.02;

4)    the ALJ failed to properly evaluate her treating physician's opinion; the

5)    the ALJ improperly assessed her credibility; and

6)    ALJ did not adequately assess her RFC.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that

impairment meets or equals an impairment included in the Listings;[4] (4) whether such impairment prevents claimant from performing PRW;[5] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520 and 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b) and 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

---

[4] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525 and 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526 and 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[5] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h) and 416.920(h).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is

supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

Because Plaintiff is proceeding pro se, the court has liberally construed her brief to allow for the development of potentially meritorious claims. *See Boag v. MacDougall*, 454 U.S. 364, 365 (1982); *see also Barnett v. Hargett*, 174 F.3d 1128, 1133 (10th Cir. 1999) (stating that the mandated liberal construction of pro se pleadings means only that if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so).

1.    Evaluation of Severe Impairments at Step Two

Plaintiff argues she had the following severe impairments: degenerative disc disease of the cervical spine; degenerative disc disease of the lumbar spine; GERD; diverticulosis; history of coronary artery disease; history of sinus bradycardia; history of congestive heart failure; headaches; visual disturbances that included blurred vision, loss of color, vision graying, and visual changes based on position; frequent nosebleeds;

extreme neck and back pain; severe fatigue; trembling throughout her body; history of stroke and brain injury with frontal lobe lesion, resulting in cognitive difficulties and memory loss; and lumbar spinal stenosis and spinal arachnoiditis. [ECF No. 23 at 2–3].

The Commissioner argues the ALJ adequately accounted for Plaintiff's cervical and lumbar impairments and heart condition in the assessed RFC. [ECF No. 24 at 6]. She claims that any error in assessing the severity of Plaintiff's impairments at step two was remedied in the RFC assessment. *Id.* at 8–9. She maintains the medical evidence generally showed normal cardiac functioning or benign results from cardiac testing. *Id.* at 6–7. She contends the record does not suggest that Plaintiff's cognitive and visual problems were severe. *Id.* at 7 n.1. She maintains the record reflected a history of treatment for glaucoma, cataracts, and blurred vision, but showed Plaintiff to have vision that was correctable with glasses. *Id.* at 7 n.1. She also argues the record lacks objective evidence to indicate Plaintiff suffered a stroke. *Id.* at 7 n.1.

A severe impairment "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c); *see also* SSR 96-3p. A nonsevere impairment "must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p, citing SSR 85-28; *see also* 20 C.F.R. §§ 404.1521(a), 416.921(a) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.[6]").

---

[6] Basic work activities include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of

The ALJ's recognition of a single severe impairment at step two ensures that he will progress to step three. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("[A]ny error here became harmless when the ALJ reached the proper conclusion that [claimant] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence."). Therefore, this court has found no reversible error where the ALJ neglected to find an impairment to be severe at step two provided that he considered that impairment in subsequent steps. *See Washington v. Astrue*, 698 F. Supp. 2d 562, 580 (D.S.C. 2010) (collecting cases); *Singleton v. Astrue*, No. 9:08-1982-CMC, 2009 WL 1942191, at *3 (D.S.C. July 2, 2009).

The ALJ found that Plaintiff's severe impairments included degenerative disc disease of the cervical and lumbar spine, diverticulitis, hypertension, hypothyroidism, GERD, and coronary artery disease with a history of myocardial infarction. Tr. at 14. He noted that Plaintiff had been diagnosed with glaucoma, cataracts, gastritis, and plantar calcaneal spur, but determined that the impairments were not severe because "they are not supported by objective signs, symptoms or laboratory findings or no more than minimally affect her ability to perform basic work activities as outlined by 20 CFR 416.908." Tr. at 15. He found that anxiety did not "cause more than minimal limitation to the claimant's ability to perform basic mental work activities" and was "therefore nonsevere." *Id.*

---

judgment; responding appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b) and 416.921(b).

Because the ALJ found that Plaintiff had severe impairments at step two and proceeded to subsequent steps, any error in assessing her impairments at step two was harmless. *See Washington*, 698 F. Supp. 2d at 580; *Singleton*, 2009 WL 1942191, at \*3. Nevertheless, the court has considered and addressed below whether the ALJ adequately considered Plaintiff's credibly-established severe impairments at subsequent steps in the evaluation process.

2.     Listing 1.04

Plaintiff argues she has lumbar spinal stenosis with pain and weakness that impairs her ability to ambulate. [ECF No. 23 at 3]. She contends she has pseudoclaudication with symptoms in her lower back and bilateral hips and legs. *Id.* She further maintains that she has spinal arachnoiditis and spinal stenosis that cause bladder incontinence. *Id.*

"In evaluating a claimant's impairment, an ALJ must fully analyze whether a claimant's impairment meets or equals a 'Listing' where there is factual support that a listing could be met." *Huntington v. Apfel*, 101 F. Supp. 2d 384, 390 (D. Md. 2000), citing *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986) (remanded, in part, because of ALJ's failure to specifically identify relevant Listing and compare each of the Listed criteria to the evidence of the claimant's symptoms). "The ALJ's analysis must reflect a comparison of the symptoms, signs, and laboratory findings concerning the impairment, including any resulting functional limitations, with the corresponding criteria set forth in the relevant listing." *Id.* "In order to meet a Listing, every element of the listing must be satisfied." *Id., citing Sullivan v. Zebley*, 493 U.S 521, 531 (1990).

"A claimant is entitled to a conclusive presumption that he is disabled if he can show that his disorder results in compromise of a nerve root or the spinal cord." *Henderson v. Colvin*, 643 F. App'x 273, 276 (4th Cir. 2016). However, the claimant bears the burden of demonstrating that the impairment meets or equals the Listing. *Id.*, citing *Kellough v. Heckler*, 785 F.2d 1147, 1152 (4th Cir. 1986).

To meet the requirements of Listing 1.04, the claimant must have "[d]isorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord" and must meet the requirements in either paragraph A, B, or C. 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 1.04. Paragraph A requires "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 1.04(A). Paragraph B requires "[s]pinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 1.04(B). Paragraph C requires "[l]umbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by

27

chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 1.04(C).

The ALJ considered Listing 1.04, but found that Plaintiff's impairment did not meet or equal the Listing because MRI examinations showed no significant herniation, stenosis, or nerve-root impingement. Tr. at 16–17.

The December 19, 2012 MRI report suggests that Plaintiff had degenerative disc disease and a herniated nucleus pulposus that resulted in moderate central canal stenosis and moderate-to-severe right-sided exit foraminal narrowing. Tr. at 534. This suggests that Plaintiff's impairment met the criteria in the introductory paragraph to Listing 1.04. However, even accepting Plaintiff's reports of neuro-anatomic distribution of pain, a need for frequent changes of position, and chronic pain and weakness, a comparison of the evidence of record and the requirements in paragraphs A, B, and C does not show that she met the Listing. Paragraph A requires motor loss, accompanied by sensory or reflex loss, but the record consistently indicates Plaintiff had normal motor strength[7], sensation, and reflexes. *See* Tr. at 544, 547, 551, 671, 704–05, and 932. Plaintiff's impairment did not meet the criteria in paragraph B because she did not undergo surgery and the imaging reports are not consistent with spinal arachnoiditis. *See* Tr. at 534, 535, 639, 696, and 946. Finally, Plaintiff's impairment did not meet the requirements in paragraph C because she cannot show that she was unable to ambulate effectively. While Plaintiff testified that she ambulated with a cane (Tr. at 47), her alleged use of a single cane is insufficient to meet the Listing's requirement. Pursuant to Listing 1.00B2b,

---

[7] Dr. Beringer observed Plaintiff to have decreased strength on March 29, 2013, but noted that "[s]he did not appear to provide full effort to [manual muscle testing]." Tr. at 665.

> Inability to ambulate effectively means an extreme limitation of the ability to walk: i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

Plaintiff has pointed to no evidence to suggest that she required the use of a hand-held assistive device that limited the functioning of both upper extremities. Furthermore, the undersigned notes that Plaintiff failed to demonstrate that her cane was prescribed by a physician and treatment notes generally suggested Plaintiff had a normal gait and did not reference use of a cane. *See* Tr. at 551, 654, and 704.

In light of the foregoing, the ALJ did not err in concluding that Plaintiff failed to prove that her impairment met or equaled Listing 1.04.

### 3.    Listing 12.02

Plaintiff argues she had a lesion on the frontal lobe of her brain and a history of stroke and traumatic brain injury. [ECF No. 23 at 3]. She maintains she experienced cognitive difficulties and memory loss. *Id.* She contends she had lost past educational knowledge, including foreign language abilities, and exhibited slowed physical, mental, and verbal responses. *Id.*

Listing 12.02 pertains to organic mental disorders and requires "[p]sychological or behavioral abnormalities associated with a dysfunction of the brain." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.02. The claimant's "[h]istory and physical examination or laboratory tests" must "demonstrate the presence of a specific organic factor judged to be

etiologically related to the abnormal mental state and loss of previously acquired functional abilities." *Id.* To prove disability under Listing 12.02, the individual's impairment(s) must satisfy the diagnostic criteria in the introductory paragraph and the criteria of both paragraphs A and B or A and C. *Id.*

Paragraph A requires "demonstration of a loss of specific cognitive or affective changes and the medically documented persistence" of one or more of the following:

1.    Disorientation to time and place; or

2.    Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past); or

3.    Perceptual or thinking disturbances (e.g., hallucinations, delusions); or

4.    Change in personality; or

5.    Disturbance in mood; or

6.    Emotional lability (e.g., explosive temper outbursts, sudden crying, etc.) and impairment in impulse control; or

7.    Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing, e.g., the Luria-Nebraska, Halstead-Reitan, etc.

20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.02(A).

To satisfy the requirements of paragraph B, the individual's impairment must result in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of

decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.02(B).

Paragraph C requires a "[m]edically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support" and one or more of the following:

1.    Repeated episodes of decompensation, each of extended duration; or

2.    A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3.    Current history or 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such arrangement.

20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.02(C).

The ALJ did not specifically consider Listing 12.02, but found that none of Plaintiff's impairments met or was equal in severity to a Listed impairment. Tr. at 17. He found that the evidence did not substantiate Plaintiff's reported history of stroke. Tr. at 19.

The record before the court fails to establish the presence of an organic mental disorder. As an initial matter, the record lacks evidence that Plaintiff suffered psychological or behavioral abnormalities. The ALJ noted that Plaintiff had not alleged severe mental impairments. Tr. at 16. This was consistent with the state agency consultants' assessments. *See* Tr. at 64 and 110. Although Plaintiff occasionally endorsed depression, anxiety, and memory problems (Tr. at 901, 906, 911, 912, 916, 921, 971, 975,

and 978), her physicians generally described her psychiatric examinations as normal and did not document objective evidence of psychological or behavioral abnormalities. *See* Tr. at 539, 547, 556, 611, 658, 685, 753, 870, 902, 922, 945, 956, 959, et al. The consultative physician observed Plaintiff to be alert and oriented to time, person, place, and condition and to have normal mental status, including general understanding, fund of knowledge, insight, attention, concentration, recent and remote memory, speech, hygiene, affect, and calculative ability. Tr. at 704.

The record is also devoid of history and physical examination or laboratory tests that demonstrate the presence of a specific organic factor judged to be etiologically related to an abnormal mental state or loss of previously-acquired abilities. Although Plaintiff testified that she suffered a stroke in 2000 (Tr. at 39), the records from Marymount Medical Center dated October 2007 state that Plaintiff had "no significant past medical history" and noted only that her past medical history was "[p]ositive for panic attack" and "LE edema." Tr. at 377, 380, 482, 484, and 486. Plaintiff also reported in 2010 that she had no significant medical history. *See* Tr. at 391 and 394 ("PAST HISTORY: Illnesses – none; Surgeries – no prior surgeries"). Later records indicate a questionable history of stroke or mini-stroke (Tr. at 428, 440, 489, 515, 546, et al.) or a reported history of stroke or mini-stroke (Tr. at 448, 452, 473, 538, 657, 683, et al.). However, as the ALJ noted (Tr. at 19), none of the physical examinations or laboratory tests in the record before the ALJ established that Plaintiff had a stroke. While Plaintiff submitted an MRI of her brain to the Appeals Council that showed a single nonspecific T2 white matter hyperintensity in the right frontal lobe (Tr. at 991–93), the MRI report

contains no clinical correlation to establish a diagnosis or to indicate the findings suggested a history of stroke.

In addition, the only suggestion in the record that Plaintiff might meet the paragraph A criteria was her self-reported memory impairment, which was not verified through any objective means and was refuted by the consultative examination. *See* Tr. at 704; *see also* 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.02(A).

The ALJ generally considered the paragraph B criteria and found that Plaintiff had no limitation of activities of daily living, social functioning, or concentration, persistence, or pace and had experienced no periods of decompensation of extended duration. Tr. at 16. He based this determination on a history of normal psychological examinations and Plaintiff's reports that she performed household chores, prepared meals, drove, and went outside multiple times each day. Tr. at 16. Plaintiff has cited and a review of the record has yielded no substantial evidence to refute the ALJ's conclusion that Plaintiff did not meet the paragraph B criteria under Listing 12.02.

Finally, Plaintiff has failed to reference and a review of the record has not revealed substantial evidence that she had repeated episodes of decompensation, a residual disease process that had resulted in marginal adjustment, or an inability to function outside a highly supportive living arrangement. *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.02(C).

In light of the forgoing, Plaintiff has failed to carry the burden to prove that she met the requirements for a finding of disability under Listing 12.02.

4.     Treating Physician's Opinion

Plaintiff submitted to the Appeals Council a physician's statement signed by Preeth A. Menon, M.D. ("Dr. Menon"). Tr. at 994–95. Dr. Menon indicated Plaintiff had a permanent disability and was "not able to work." Tr. at 994. He stated Plaintiff could engage in the following activities for less than two hours each during a workday: sitting, standing, walking, climbing ladders and stairs, kneeling/squatting, bending/stooping, pushing/pulling, keyboarding, lifting, and carrying. *Id.* He indicated Plaintiff could not carry more than five pounds for more than 20 minutes per day. *Id.* He stated Plaintiff's primary disabling diagnosis was cervicalgia and her secondary disabling diagnosis was pain. Tr. at 995. He indicated Plaintiff "needs surgery." *Id.*

Plaintiff argues that Dr. Menon was her "primary care physician" and that the ALJ failed to consider his opinion that she be approved for permanent disability. [ECF No. 23 at 6]. The Commissioner maintains that none of Plaintiff's treating physicians indicated Plaintiff had restrictions that would preclude work activity. [ECF No. 24 at 9].

The court notes that Dr. Menon's opinion was not in the record before the ALJ and was submitted to the Appeals Council for review. *See* Tr. at 6. Claimants may submit additional evidence to the Appeals Council that was not before the ALJ at the time of the decision. *Meyer v. Astrue*, 662 F.3d 700, 705 (4th Cir. 2011). If the evidence is new, material, and relates to the period on or before the date of the ALJ's hearing decision, the Appeals Council should evaluate it as part of the entire record. *Id.* Here, the Appeals Council conceded that Dr. Menon's opinion was new and material by admitting it into the record. *See* Tr. at 6.

"Confronted with such new and material evidence, the Appeals Council then 'evaluate[s] the entire record including the new and material evidence.'" *Meyer*, 662 F.3d at 705, citing *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991). If the Appeals Council finds that the ALJ's "action, findings, or conclusion is contrary to the weight" of all evidence, including the new and material evidence, the Appeals Council will grant the request for review and either issue its own decision on the merits or remand the case to the ALJ. *Id.*, citing 20 C.F.R. §§ 404.970(b) and 416.1470(b). On the other hand, if after considering all evidence, the Appeals Council decides that the ALJ's actions, findings, and conclusions were not contrary to the weight of the evidence, the Appeals Council can deny review with or without explaining its rationale. *Id.* at 705–06.

Although the Social Security Administration's rules and regulations require that ALJ's carefully evaluate and specify the weight they accord to medical opinions and the reasons for that weight (*See* 20 C.F.R. §§ 404.1527 and 416.927 and SSRs 96-2p and 96-5p), the Appeals Council is not held to the same standard unless it grants the request for review. *See id.* at 706 ("Only if the Appeals Council grants a request for review and issues its own decision on the merits is the Appeals Council required to make findings of fact and explain its reasoning."), citing 20 C.F.R. §§ 404.967, 404.979, and 404.1527(f)(3). Here, the Appeals Council concluded that the additional evidence provided no basis for changing the ALJ's decision (Tr. at 2) and denied the request for review (Tr. at 1). Thus, the Appeals Council was not required to provide a detailed explanation as to how it weighed Dr. Menon's opinion.

Despite the Appeals Council's determination that the new and material evidence provided no basis for changing the ALJ's decision, the court retains the authority to consider that evidence as part of the entire record in determining whether the ALJ's decision was supported by substantial evidence. "In reviewing the Appeals Council's evaluation of new and material evidence, the touchstone of the Fourth Circuit's analysis has been whether the record, combined with the new evidence, 'provides an 'adequate explanation of [the Commissioner's] decision.'" *Turner v. Colvin*, C/A No. 0:14-228-DCN, 2015 WL 751522, at *5 (D.S.C. Feb. 23, 2015), citing *Meyer*, 662 F.3d at 707 (quoting *DeLoatche v. Heckler*, 715 F.3d 148, 150 (4th Cir. 1983)). After reviewing new evidence submitted to the Appeals Council, the court should affirm the ALJ's decision to deny benefits where "substantial evidence support[ed] the ALJ's findings." *Id.* at 707, citing *Smith v. Chater*, 99 F.3d 635, 638–39 (4th Cir. 1996). However, if a review of the record as a whole shows "that new evidence from a treating physician was not controverted by other evidence in the record," the court should reverse the ALJ's decision and find it to be unsupported by substantial evidence. *Id.*, citing *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.3d 93, 96 (4th Cir. 1991). If the evidence is not so one-sided as to allow the court to determine, upon consideration of the record as a whole, whether substantial evidence supported the ALJ's denial of benefits, the appropriate course of action is for the court to remand the case for further fact finding. *Id.*

The court has carefully considered Plaintiff's argument in view of language in *Meyer*, 662 F.3d at 706, that "analysis from the Appeals Council or remand to the ALJ for analysis would be particularly helpful when the new evidence constitutes the only

record evidence as to the opinion of the treating physician." Here, as in *Meyer*, the ALJ specifically noted that "[n]one of the claimant's treating physicians placed restrictions on her that would preclude work activity within the above established residual functional capacity." Tr. at 22. However, this case may be distinguished from *Meyer* in that the record is devoid of evidence to support Dr. Menon's opinion or the alleged treatment relationship.

Plaintiff has failed to cite any records that confirm an examining or treating relationship with Dr. Menon. The undersigned's review of the record yields no evidence from or reference to Dr. Menon and indicates other medical providers to be Plaintiff's primary care provider on or around the date indicated on the opinion form. On July 24, 2013, Dr. Young indicated Plaintiff had been referred by Linda Buster ("Ms. Buster") and that her primary provider was Dr. Kenneth Crutcher. Tr. at 900. Records from Cardiology/Gastroenterology Associates of Myrtle Beach, P.A. dated October and November 2013 indicate Plaintiff was referred by Karen McCutcheon, M.D. and Ms. Buster, a nurse practitioner. Tr. at 892 and 896. Dr. Sloan indicated Plaintiff's primary care physician was "Crutcher" on March 27, 2014. Tr. at 988. Plaintiff indicated "Dr. Kenneth Crutcher" to be her primary doctor on a patient information form she completed on May 5, 2014. Tr. at 937.

A medical provider's opinion is not entitled to deference and is entitled to significantly less weight if there is no examining or treating relationship. *Cf. Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (explaining that ALJs should not rely on opinions from non-treating, non-examining physicians that are contradicted by other

evidence of record); 20 C.F.R. §§ 404.1527 and 416.927 (explaining generally the factors that should be considered in weighing medical opinions and providing that the adjudicator should consider the examining relationship, the treatment relationship, the supportability of the opinion in the medical source's records, the consistency of the opinion with the record as a whole, the medical source's specialization, and any other factors that may be relevant to the evaluation of the opinion); SSR 96-2p (providing that "a case cannot be decided in reliance on a medical opinion without some reasonable support for the opinion" and that controlling weight may only be accorded to a treating source's opinion if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in the case record"); 96-5p (clarifying how the adjudicator should consider medical source opinions).

Furthermore, Dr. Menon's opinion does not explain how Plaintiff's impairments supported the specified restrictions. *See* Tr. at 994–95; *see also* 20 C.F.R. §§ 404.1527(c)(3) and 416.927(c)(3).

In the absence of clinical findings to support the opinion and medical records to confirm an examining or treatment relationship between Plaintiff and Dr. Menon, the Appeals Council did not err in finding that Dr. Menon's opinion provided no basis for changing the ALJ's decision. Thus, the ALJ's decision continued to be supported by substantial evidence with the addition of Dr. Menon's opinion.

5.    Credibility Assessment

Plaintiff argues the ALJ erred in discounting her credibility based on the effort she provided during testing and her cessation of physical therapy. [ECF No. 23 at 6]. She contends the ALJ minimized the severity of her spinal injuries. *Id.* She maintains the ALJ failed to consider that her past efforts to work had exacerbated her heart problems and that she had been fired from positions because of her visual and cognitive problems. *Id.*

The Commissioner argues the ALJ adequately considered multiple notations in the record that suggested Plaintiff was not giving full effort during physical therapy and examinations. [ECF No. 24 at 5–6]. She maintains the ALJ could not find Plaintiff disabled merely based on her subjective allegations and rejected the alleged impairments that were not supported by the record. *Id.* at 9. She contends the ALJ considered the whole record in concluding that Plaintiff's allegations were not entirely credible. *Id.* at 9. She maintains the ALJ considered Plaintiff's reports to her physicians and her testimony in finding that her allegations were not entirely credible. *Id.* at 10.

After finding that a claimant has a medically-determinable impairment that could reasonably be expected to produce her alleged symptoms, the ALJ should evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the limitations they impose on her ability to do basic work activities. SSR 96-7p.[8]  If the

---

[8] The Social Security Administration recently published SSR 16-3p, 2016 WL 1119029 (2016), which supersedes SSR 96-7p, eliminates use of the term "credibility," and clarifies that subjective symptom evaluation is not an examination of an individual's character. Because the ALJ decided this case prior to March 16, 2016, the effective date of SSR 16-3p, the court analyzes the ALJ's decision based on the provisions of SSR 96-7p, which required assessment of the claimant's credibility. Although SSR 16-3p

claimant's statements about the intensity, persistence, or limiting effects of her symptoms are not substantiated by the objective medical evidence, the ALJ is required to consider the claimant's credibility in light of the entire case record. *Id.* The ALJ must consider "the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *Id.* In addition to the objective medical evidence, the ALJ should also consider the claimant's ADLs; the location, duration, frequency, and intensity of her pain or other symptoms; factors that precipitate and aggravate her symptoms; the type, dosage, effectiveness, and side effects of her medications; treatment, other than medication, the claimant receives or has received; any measures other than treatment and medications the claimant uses or has used to relieve her pain or other symptoms; and any other relevant factors concerning the claimant's limitations and restrictions. *Id.*

The ALJ must cite specific reasons to support his finding on credibility, and his reasons must be consistent with the evidence in the case record. *Id.* His decision must clearly indicate the weight he accorded to the claimant's statements and the reasons for that weight. *Id.* In *Mascio v. Colvin*, 780 F.3d 632, 639–40 (4th Cir. 2015), the court emphasized the need to compare the claimant's alleged functional limitations from pain to the other evidence of record and indicated an ALJ should explain how he decided which of a claimant's statements to believe and which to discredit. The court

---

eliminates the assessment of credibility, it requires assessment of most of the same factors to be considered under SSR 96-7p.

subsequently stressed that an ALJ's decision must "build an accurate and logical bridge from the evidence" to the conclusion regarding the claimant's credibility. *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016), citing *Clifford v. Apfel*, 227 F.3d 872 (7th Cir. 2000).

The ALJ found that Plaintiff's medically-determinable impairments could reasonably be expected to cause the alleged symptoms, but that her statements concerning the intensity, persistence, and limiting effect of her symptoms were not entirely credible. Tr. at 18. He cited inconsistencies between Plaintiff's testimony, her reports, and the medical evidence of record. *Id.* He indicated that the medical evidence did not substantiate Plaintiff's reported history of myocardial infarction and stroke. Tr. at 19 and 20–21. He observed that records from imaging of Plaintiff's lumbar spine were unremarkable in March 2011. Tr. at 19. He noted that Plaintiff reported that she was walking five miles at a time on three days per week at that time. *Id.* He indicated Plaintiff was discharged from physical therapy for failing to attend in May 2011. *Id.* He noted that MRIs of Plaintiff's cervical and lumbar spine showed degenerative disc disease and moderate central canal stenosis and right-sided exit foraminal narrowing at C5-6. *Id.* He observed that Plaintiff participated in physical therapy again in 2013, but that the physical therapist indicated she was not giving full effort. *Id.* He indicated Dr. Beringer noted that Plaintiff had not provided full effort in April 2013. *Id.* He stated Dr. Anderson observed that Plaintiff had received no treatment in the six months before she presented to him in May 2014 and had normal strength and reflexes. *Id.* He stated Plaintiff had not been compliant with taking her prescribed thyroid medications. Tr. at 20. He recognized that

Plaintiff had told Dr. Roberts that her termination of work in September 2012 was unrelated to health problems and that she reported performing a variety of household chores, shopping, and driving. Tr. at 21. He noted that Dr. Roberts's exam yielded mostly normal findings and that he specified that Plaintiff deliberately gave poor effort. *Id.* He indicated Dr. Wieland had noted that Plaintiff did not allege any mental health impairments in her initial or reconsideration applications. Tr. at 21–22.

The court finds the ALJ adequately assessed Plaintiff's credibility as required by SSR 96-7p and provided a logical explanation for his finding that her allegations were not entirely credible. In reaching his conclusion, the ALJ relied on the objective medical evidence, Plaintiff's statements and self-reported activities and limitations, and the examination reports from Plaintiff's physicians and other medical providers. *See generally* Tr. at 18–22.

Although Plaintiff argues the ALJ erred in reducing her credibility based on an erroneous conclusion that she discontinued physical therapy and did not provide adequate effort on testing, the ALJ's characterization of Plaintiff's compliance and effort was supported by the record. *See* Tr. at 665 (noting that Plaintiff did not appear to provide full effort on manual muscle testing), 676 (indicating Plaintiff "did not seem to give full effort" during manual muscle testing), 705 (characterizing Plaintiff as giving "deliberate poor effort through ROM portion of cervical exam"), 872 (observing that Plaintiff had decreased effort on ROM testing of her neck), and 969 (stating the reason for Plaintiff's discharge from physical therapy to be "Non-compliance: Attendance").

While Plaintiff maintains that her spinal injuries were more serious than the ALJ acknowledged because she underwent cervical fusion and surgery to repair herniated discs [ECF No. 23 at 6], the ALJ properly considered the evidence before him. *See* Tr. at 19 (noting the cervical MRI findings from December 2012; indicating records from February through April 2013 suggested Plaintiff was not providing full effort; indicating CT findings from March 2013; noting that Dr. Anderson stated Plaintiff had not sought treatment over the past six months and observed that she demonstrated normal strength and reflexes in her bilateral upper and lower extremities). The court further notes that in January 2013, Dr. Beringer indicated Plaintiff did not require surgery. Tr. at 655. Although it is possible that Plaintiff underwent surgery at a later date, the record before the court is devoid of evidence of spinal surgery.

As for Plaintiff's allegation that the ALJ failed to consider that she had difficulty performing PRW because of her heart condition, visual problems, and cognitive impairments, the court defers to the ALJ's explanation as to why he did not find these impairments to be more severe. *See* Tr. at 15 (discussing the medical evidence that pertained to Plaintiff's diagnoses of glaucoma, cataracts, and blurred vision and finding that they no more than minimally affected her ability to perform basic work-related activity[9]), 19 (stating the medical evidence failed to objectively identify a history of

---

[9] Although the ALJ found that Plaintiff's glaucoma, cataracts, and blurred vision were nonsevere impairments (Tr. at 15), he accorded significant weight to Dr. Richardson's opinion, which included a restriction "from work requiring full visual fields for function and safety," among other limitations. *Compare* Tr. at 22, *with* Tr. at 112–13. He did not explain whether he was accepting or rejecting the visual limitation in Dr. Richardson's opinion, but incorporated no visual limitation in the assessed RFC. To the extent that the ALJ erred in failing to include in the RFC assessment a restriction from work requiring

myocardial infarction or stroke), and 20–21 (discussing relatively normal cardiac findings).

### 6.    RFC Assessment

Plaintiff argues the ALJ did not adequately assess the evidence in accordance with the provisions of SSR 96-8p. [ECF No. 23 at 4]. She maintains her sitting, standing, and walking restrictions precluded her from engaging in sustained work at the sedentary exertional level. *Id.* She contends she was unable to perform work-related activities on a regular and continuing basis. *Id.* at 5. She maintains she would have required excessive breaks; would have been absent from work frequently; and would have been unable to sustain concentration and pace to perform unskilled work. *Id.* at 5.

The Commissioner argues that substantial evidence supports the ALJ's RFC assessment. [ECF No. 24 at 5]. She maintains the ALJ accounted for all of Plaintiff's credibly-established functional limitations. *Id.* She contends the assessed RFC was supported by the objective medical evidence, the medical opinions of record, and Plaintiff's self-reported abilities and activities. *Id.*

To adequately assess an individual's RFC, the ALJ must determine the limitations imposed by her impairments and how those limitations affect her ability to perform work-

---

full visual fields, such error was harmless. The *DOT*'s descriptions of the jobs of storage facility rental clerk and ticket taker show "field of vision" as "Not Present—Activity or condition does not exist." DICOT 295.367-026 (G.P.O), 1991 WL 672594; DICOT 344.667-010 (G.P.O.), 1991 WL 672863. This court has traditionally excused errors as harmless in cases where the ALJ "would have reached the same result notwithstanding" the error. *See Mickles v. Shalala*, 29 F. 3d 918, 921 (4th Cir. 1994). Because a restriction on field of vision would not have precluded Plaintiff from performing the identified jobs, the ALJ would have concluded she was "not disabled" if he had included the additional limitation in the RFC assessment.

related physical and mental abilities on a regular and continuing basis. SSR 96-8p. The ALJ should consider all the claimant's allegations of physical and mental limitations and restrictions, including those that result from severe and nonsevere impairments. *Id.* "The RFC assessment must include a narrative discussion describing how all the relevant evidence in the case record supports each conclusion and must cite specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." *Id.* The ALJ must also consider and explain how any material inconsistencies or ambiguities in the record were resolved. *Id.* "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* "[R]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio*, 780 F.3d at 636, citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

The ALJ stated his RFC assessment was supported by the weight of the evidence of record and noted the following:

> There are no medical findings of such severity that suggest that the claimant is completely incapable of all work activity. There are positive findings that somewhat support some of the claimant's subjective symptoms and reported limitations. While the medical evidence of record establishes the existence of the above-mentioned impairments, the objective findings do not confirm that these impairments are of such a severity that they could reasonably be expected to produce the degree of pain and functional limitations alleged. The medical evidence of record repeatedly indicated that the claimant's severe or nonsevere impairments were adequately controlled or did not pose significant functional limitations.

Tr. at 22.

Although Plaintiff argues the ALJ incorrectly assessed her RFC, she fails to cite evidence of record that supports her claim that she was unable to meet the sitting, standing, walking, lifting, concentration, and attendance requirements necessary to perform work with the assessed limitations. As discussed above, the ALJ considered Plaintiff's allegations regarding the limitations that her impairments imposed, but provided sufficient reasons for finding them to be partially credible. *See* Tr. at 18–22. He cited specific medical and non-medical evidence that supported his findings regarding Plaintiff's credibility and her RFC. *See id.*

While the ALJ did not accept all of Plaintiff's allegations, he acknowledged that her impairments imposed some limitations and determined her RFC accordingly. He found that Plaintiff had the RFC to perform less than a full range of light work that required lifting and carrying up to 20 pounds occasionally and 10 pounds frequently and standing, walking, and sitting for six hours in an eight-hour workday. Tr. at 17. He stated Plaintiff was further limited to occasional overhead reaching with the bilateral upper extremities; could never climb ladders, ropes, or scaffolds; and must avoid working at unprotected heights or around dangerous machinery. *Id.* He acknowledged a letter Plaintiff had sent to Dr. Anderson "that indicated she had previously been advised to avoid activities that would cause compression of her cervical spine including no pushing, pulling, lifting, or lifting her arms over her head," but noted that "[a] thorough review of the medical record fails to identify these restrictions." Tr. at 19. He indicated he limited Plaintiff to "light exertional work with no climbing of ladders, ropes, or scaffolds" based on her musculoskeletal functional limitations. Tr. at 20. He recognized that Plaintiff had

been diagnosed with diverticulosis, but indicated the condition "appeared to be of mild severity." *Id.* He stated that Plaintiff's hypertension was stable and well-controlled and that she had been instructed to be compliant with her thyroid medications to reduce symptoms of hypothyroidism. *Id.* He noted that Dr. Almeida had instructed Plaintiff to continue aerobic exercises as part of her treatment for gastritis and GERD. *Id.*

The ALJ acknowledged conflicting evidence in the record regarding Plaintiff's alleged history of myocardial infarction and stroke and provided a reasoned explanation for his finding that they were not supported. He noted that the medical evidence of record did not objectively show that Plaintiff had suffered a myocardial infarction and that diagnostic testing had not shown significant ongoing cardiac-related functional limitations. Nevertheless, he included a restriction in the assessed RFC for avoidance of workplace hazards to accommodate Plaintiff's complaints of numbness and dizziness. Tr. at 21.

In light of the ALJ's explanation for his RFC assessment, the court finds that he complied with the provisions of SSR 96-8p and that substantial evidence supports his finding.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law. Based on the foregoing, the undersigned affirms the Commissioner's decision.

IT IS SO ORDERED.

January 17, 2017
Columbia, South Carolina

Shiva V. Hodges
United States Magistrate Judge